You'll hear argument next this morning in Case 15-1358, Ziegler v. Abbasi. Mr. Gershengorn. Mr. Chief Justice, and may it please the Court. This case marks the return of Iqbal, as plaintiffs seek to hold essentially the same defendants liable for the same actions arising in the same extraordinary circumstances in the wake of the September 11th terrorist attacks. All of the judges below concluded that plaintiffs' core theory is squarely foreclosed by Iqbal. But the Second Circuit majority then formulated its own list-merger theory of liability, premising liability on the alleged decision of Attorney General Ashcroft to merge the New York list of detainees, which had not been fully vetted, with the INS list, thereby continuing the hold-until-cleared policy for detainees on both lists. Bivens' liability does not attach here for at least three reasons. First, the Bivens remedy should not be extended to national security and immigration policy decisions by senior officials in the wake of the September 11th attacks. If a damages remedy is to be imposed, it's for Congress, not this Court, to do so. Second, the list-merger theory suffers from the same pleading deficiencies that this Court identified in Iqbal itself. Among other things, there is an obvious alternative and noninvidious explanation of the list-merger decision. Given the uncertainty about the status of detainees on the New York list, the list merger was undertaken to avoid the inadvertent or premature release of a dangerous terrorist. And third, the defendants here violated no clearly established right. It would not have been clear to every reasonable defendant that merging the lists in the wake of the 9-11 attacks would be unconstitutional, rather than risking premature release of a detainee on the New York list. I think the easiest way for this Court to resolve this case is through the Iqbal admonition that the existence of the Bivens remedy is an antecedent question that the Court should redress first. Let me start there. Ginsburg. You seem to be assuming that the whole case is about the merging of the New York list with the other list, but I thought that this was this case was identified as a prison conditions case. So, Your Honor, that broader theory was raised below. It was rejected by every judge to consider it below, the district court and the panel majority, and it is also, I think, beyond the – it's not within the scope of the question presented. But even if – and I think the reason that it was barred below is because it's squarely foreclosed by Iqbal, both on the substantive due process claim and on the equal protection claim. On the substantive due process claim, what we have is a facially valid constitutional policy to – to – that could be applied to individuals with individualized suspicion of terrorism. And if you look at the allegations in the complaint, and these are paragraphs 61 and 65 of the complaint, all that is alleged is that Ashcroft and Muller met regularly with a – this is on page 274A of the appendix to the petition – that in the – and this is paragraph 61 – that Ashcroft and Muller met with a small group of officials to exert maximum pressure on the individuals arrested. And then in paragraph 65 on the next page, that the punitive conditions in which the MDC and class members were placed were the direct result of the strategy. There is no allegation that Ashcroft and Muller or Ziegler created the punitive conditions or that they required the punitive conditions. They had the right, as the Second Circuit itself held and the district court held, to presume that the policy would be implemented lawfully. The only real theory that survives, I think, Your Honor, really is the list merger theory, and that theory fails. I think it's critical to understand in that context how the case – how the situation looked to the Attorney General – to Attorney General Ashcroft, who's alleged to be the decisionmaker. I'll come back to the – to the failure of the complaint to allege that he was the decisionmaker, but even taking that, what he faced was the New York list, which involved aliens, all of whom were out of status and had been picked up in the course of the pent-bomb investigation. He knew that not all of those aliens had had individualized suspicion determinations, but that some may well have had ties nexus to terrorism. And he knew that the conditions of confinement would be lawful. It is not disputed that those would be lawful as to those with individualized suspicion. Faced with that situation, the Second Circuit majority found that the list merger decision could only be explained by punitive intent or by discriminatory intent. But there is an obvious alternative explanation for the decision that Attorney General Ashcroft would have faced in deciding to merger the list is that you couldn't tell who was and who was not had – who did and who did not have a potential link to terrorism. And in that situation, a decision to hold everyone until cleared, to apply the – apply the hold until cleared policy is best explained not by invidious release of a dangerous terrorist. Breyer. Gathers went on for several months, eight months. I think the list merger decision is early on in the – it is. Yes, but weren't – weren't they held for eight months? They were held longer, and there's no doubt that the clearance policy took longer than it should. So I can understand after a bomb attack. I can understand after a bomb attack and 3,000 people are killed. I can understand that the first reaction of the law enforcement authorities is pick up anybody you might think is connected and we'll worry about the rest of it later. Now, eight months. Now, what they do allege is that Ashcroft and Mueller knew that the FBI had not developed any reliable evidence. That's paragraph 67, tying the plaintiffs to terrorism, but authorized their prolonged detention in restrictive conditions. And Mueller, it says, ordered that they be kept in INS custody and including the restrictive conditions, even after local offices reported. Ah, they don't say reported to whom. So that is a point in your favor, but that there was no reason to suspect them of terrorism. But I think fairly read, they're saying they – okay, they authorized it. They knew that some of these people had no information against them, but the answer is pick up anybody who might have a connection and then just keep them there. I mean, that's what's worrying me a lot. And why doesn't that at least state an allegation? Suppose it had been five years. Suppose it had been ten years. I mean, we all know the problems with that. And if you know it, I can see it for a day, two days, five years, eight months. I mean, why isn't that an allegation that at least you have to real deal with on discovery and so forth? You know, Your Honor, because I think the core of the allegation against Ashcroft and Mueller is not that they prolonged the – prolonged the detention. The policy that they adopted in the List merger decision was facially constitutional because it adequately dealt with and fully dealt with the dilemma that they faced. How long after 9-11 did they adopt that policy? I believe it was in – within the first months after 9-11. First months? Yes. How many months? Your Honor, the – I apologize. I don't have the exact number. Well, is it more like eight months or more like – No, Your Honor. No. It is in October. I believe it's in October after the – in October after the – after the attacks. And so we're not talking – this was not something that was done eight months down the road. This is something that was done as the officials are trying to sort through how to respond to the very difficult situation that the – if you accept that the Attorney General made the decision that he found themselves in. He had a list that was not fully vetted. Some of the people on the list had ties to terrorism – may have had ties to terrorism. Some of them may well not have. And what – what in that situation, application of the hold till cleared policy. Take a breath. Let's figure out what's going on. Rather than releasing everyone is – was not – not only doesn't raise a discriminatory inference, but it does not violate any clearly established right to have done that. Now, the second – What about – what about the – it's one thing, as Justice Breyer pointed out, to say you initially hold these people, but you know from day one that many of them have nothing to do with terrorists. And yet, you allow that system that might have been justified in October to persist for months and months when these people are being held in the worst possible conditions of confinement. Your Honor, they are – well, they are being held in restrictive conditions of confinement, but those conditions are lawful as to folks with individualized suspicion. Now, the – the – there is – the core of the claim that the Second Circuit saw against Attorney General Ashcroft was the decision to submit the individuals to the – to the restrictive conditions in the first place. And what I would say to that is it understated – it attempts to impose a 20-20 hindsight requirement on the Attorney General and on Director Mueller and Ziegler, who are – who are involved only as having, quote, condoned the policy, that just doesn't exist. The plaintiffs say we had – there were no allegations of terrorism ties against us. But, of course, the Attorney General didn't know that at the time. What he had was a list. It had some with ties and some after. And the policy to merge the list and hold until cleared was facially constitutional. If it took – if there was – in some instances took too long to clear, and certainly the OIG report suggests that was the case, that things did not run as smoothly as they should have, that is not something that's attributable to – to Attorney General Ashcroft, Director Mueller, or to – to Commissioner Ziegler. So the argument you're presenting, a Bivens argument or a qualified immunity argument? So, Your Honor, the argument we've been discussing now is the qualified immunity Iqbal argument. It's the personal participation. But we do think the Bivens remedy should not be extended here at all. It would be quite an extension of Bivens, unprecedented, to apply this to national security and immigration policy decisions. And we think all three of those factors work together. With respect to national security, what this Court has recognized is national security is committed to congressional authority, that Congress is better placed to – to decide the appropriate remedy. And the reason for that is not only a matter of institutional competence, but that the risk of over-deterrence in the national security context is a real one, and it's one that Congress should make. And that's, I think, the core of this Court's decisions in Chappelle and in Stanley. I think the same is true with respect to policy decisions more broadly. Congress has provided a remedy to challenge policy decisions in the APA. And in addition to that, policy decisions are much more likely to receive attention, as this set of policy decisions did, from the OIG and from – from Congress itself. And so the APA argument strikes me as – as somewhat odd. I mean, the idea that the people in prison are supposed to say, let's look at the Administrative Procedures Act. What about habeas? Is that an available remedy for them? It is an available remedy, and indeed it was used here by – invoked by some, and those folks were released. And it does – because the core of the complaint was you're holding us without bond, we should be essentially deported for the illegal remedies. And so I do think that the availability both of habeas here, and I take Your Honor's – I take Your Honor's admonition, but – about the oddity of the APA here. But if the APA doesn't apply here, it's because Congress provided it for policies and provided review for some policies, but not for all policies. And that is where – that is the congressional judgment. But it seems to me that is the core of the question. Ginsburg's question was, why were they released to habeas when they were locked up without access to a lawyer, without access to a telephone? So, Your Honor, there were individuals who did file habeas petitions, and – and those individuals were largely released before the claims could be adjudicated. But the point here is that – that Bivens – the extension of Bivens would really be quite extraordinary to a national security and immigration policy context. The immigration concerns, I think, do raise the exact same concerns, Your Honor, as the national security ones. Breyer. I suppose that in 1942, there was a President or a Secretary of Defense who decided, let's take 140,000 people, 60,000 – 70,000 citizens and 60,000 noncitizens, and lock them up for 10 years, or 5 years, or 4 years. All right. You go with habeas right at the time. You can understand how in January of 1942, it would be pretty tough for a judge in a district court to start second-guessing people. But several years later, people have the time to develop the information. They understand what people knew then. And they might find that in some of those instances, there was no justification whatsoever. Now, I look at the Bivens remedy and say, one, it has a cautionary effect. It doesn't deter where necessary, where necessary. And then where a big mistake was made, it has the possibility of compensation later. Now, that's the whole argument. But beware of cutting off Bivens. You never know what will happen. So, Your Honor, I guess I would say a few things to that. First of all, although I recognize Your Honor is not suggesting that, this is illegal immigration violation in the context of a specific investigation. No, not at all. I use a historic example, and I'm not worried about this case. I am worried. I'm thinking. Yeah, yeah. Okay. I'm worried about the precedent. Even with respect to Your Honor's hypo, I think it actually points up the problem with extending Bivens to national security policy decisions and to policy decisions in general. It should not be in the national security policy context that this Court should be calibrating the deterrence and under-deterrence and over-deterrence in that situation. That is a judgment for Congress. And if Your Honor is serious about compensation, and this is the problem with policies, it should be, it can't really be the case that the right way to get effective compensation is to put the Attorney General, the Director of the FBI, and the Commissioner of the INS personally on the hook for the whole class. The Secretary of the Treasury ---- of Bivens action, it has to be cut off at the lower level of officials. It can't be to the highest officials. What authority do we have? It's not the highest level of officials, Your Honor. It's when there's a broad national security policy. And I think that is what this Court said on page 74 of Malesko, that the way we challenge policy decisions is not through Bivens. It's ordinarily through an injunctive action. If I could reserve the balance of my time. Roberts. Thank you, General. Mr. Lamken. Lamken. Thank you, Mr. Chief Justice, and may it please the Court. On behalf of Mr. Hastey and Sherman, I wanted to begin with qualified immunity, in particular with respect to the official conditions. This case asks the Court to hold that individual jailers are responsible in damages for failing to overturn FBI terrorism classifications and the confinement conditions they produce. But a reasonable jailer could have understood and believed it lawful in the circumstance of this case to do as the BOP directed them, which is to hold detainees in restrictive conditions based on those FBI designations until the FBI clearly determined the level of restriction. This is not just restriction. This is the BOP directed that you would use the most restrictive conditions permissible. The specific implementation was left to Mr. Hastey and Sherman. But there's no allegation that the difference between the unconstitutional conduct based on the difference between what the BOP directed and what the Mr. Hastey and Sherman did. The allegation here is that it was impermissible to impose these highly restrictive conditions because the FBI didn't actually have information connecting these individuals to terrorism. And as Mr. Hastey and Sherman somehow knew that, and as a result, it was impermissive, impermissible to impose these conditions  from a plausibility perspective, and it doesn't make any sense from a qualified immunity perspective. Mr. Hastey and Sherman are jailers. They're expert in ensuring secure conditions. They're not trained in determining security classifications or connections to international terrorism. They cannot be held liable for failing to overturn the FBI's determinations. After all, just last week, this Court held that there's no clearly established law that requires an officer to overturn or second-guess the fellow officer's decisions made in a particular context. That should go double when you're asking the jailers to overturn the determinations made by the FBI. The jailers don't get to release people because they decide the court system got it wrong and the people are actually innocent, and they should be. Ginsburg. What about all the conduct that was not directed by the Attorney General or the FBI? Hastey. Hastey. Yes, Your Honor. I think that that the most you're referring to the unofficial conditions or the unauthorized abuses by individual guards. Those claims, yes. Ginsburg. Yes. Am I right that as to those, the Second Circuit was unanimous? Hastey. Yeah. As to those, the Second Circuit was unanimous. But they – I think they overlooked one critical thing, and they tended to read this complaint as if it were a complaint for injunctive relief. There were a lot of things wrong. They weren't being redressed. They should be redressed by the courts. But it's not. This is actually an action for individual damages against Mr. Hastey for conduct committed by others. And in order to establish a plausible claim to that sort of relief, liability that he pays damages where others did, they would have to show that Mr. Hastey not only knew that there was this misconduct, not only knew that he needed to intervene, but that after he failed to intervene, then the plaintiffs were injured as a result of the failure to intervene. That their injuries were caused by what Mr. Hastey failed to do. And that's what's missing from the Second Circuit's analysis, and that's what's missing from the complaint. There's simply no temporal connection, no connection whatsoever between the proposed and the proposed. Ginsburg. And you're in charge of a detention facility, and all these things are going on. Prisoners are being knocked against walls. Their arms are being twisted. And they're having some complaints. And nothing is done. It just continues to go on. Kennedy. And the allegation is that he deliberately did not take a routine inspection of that particular portion of the prison in order to be willfully blind as to what was going on? Well, there's no doubt that misconduct occurred. And there's no doubt that Mr. Hastey actually sees the complaints, because that's part of the grievance process. But what's missing from this is these individual plaintiffs being injured after this is brought to his attention. If you review the complaint, it doesn't have a moment where he says this is when he learned, and after that, we were injured. It's more of a blunderbuss that says because there are a lot of bad things happening, Mr. Hastey must be liable for all of them. You can't say that. How could you pinpoint one particular moment in time when this is ongoing behavior? And I think the answer is that you pinpoint his awareness in the injuries that these Respondents are claiming damages for. And if you say it in paragraph 74, it says, indeed, after a few months of interacting with the plaintiffs, the MDC defendants, I take it those are the people we're talking about, realized that they were not terrorists, but merely immigration detainees. Yet the restrictive conditions and harsh treatment continued. So what is that but an allegation that they did know about it, and they did continue the harsh treatment? Fisherman So, Justice Breyer, referring specifically to the unofficial abuses by the guards as opposed to the official conditions temporarily, what's missing there is what happened afterwards. What were the specific abuses he was aware of? Is this guard misconduct, or is it tapping the bars at night and keeping people awake? And then the second question is the restrictive conditions and harsh treatment and elsewhere in the complaint, they have a list of all of them. Fisherman And that's exactly the difficulty, is that he's aware of harsh treatment generally, and therefore, he must be liable for all harsh treatment that occurs after that awareness. They cannot say that there's abuses generally with no particular time frame, and then hold him liable for every intentional tort that occurs in the institution. And I think that paragraph 74 and 77, which the Second Circuit described as detailed, actually illustrate precisely the problem. They don't say which abuse he's aware of. They don't say when, whether it predates or postdates the claims that they have. They must plead facts that show that Mr. Heastie is personally responsible. In fact, when they finally get to a date, which is paragraph 110 of the complaint, they say, February 11th, 2002. Well, by February 14th, 2002, four of the six Respondents are already outside of ADMACS. They never explain why awareness on a time after their last institution is a basis for holding Mr. Heastie liable. If I could go back, however, to the official conditions, Your Honor, with respect to the official conditions, qualified immunity must be granted. There's simply no basis for saying that it is that every reasonable jailer would understand that they had to make their own determination that these were not terrorism detainees and overturn what the FBI was telling them. And it's especially true given that the FBI was, throughout this process, making determinations and clearing people. There's no clearly established law that requires jailers to be making those decisions for the FBI. In fact, society would be ill-served if we asked jailers to do that. They are not experts in international terrorism. They are experts in maintaining security. Finally, if I can end up where the acting the scope of Bivens. Special factors in this case, counsel hesitation. Congress, rather than the courts, has to decide what are the consequences of saying that individual jailers, somebody all the way at the bottom of that food chain, must second-guess the FBI. What are the consequences for the government's ability to have a coherent response to a national terrorist attack? That is precisely the type of thing that Congress, rather than the courts, should decide. In addition, the linchpin of the claims against the -- against these individuals is that the FBI had gotten these things wrong. That means that they're going to need to prove, claim to want to prove, that the FBI had things wrong. It implicates, cases like this implicate the need to access sensitive legislation. Robertson, so if the official policy that was adopted, that we want to beat the prisoners, you know, every day, and that was the FBI policy, and it's communicated down, the prison administrator has no choice but to carry out that policy? No, Your Honor. I think in terms of there being a facially unlawful command, that is where you don't have qualified immunity. But there's nothing facially unlawful that says impose the most restrictive conditions permissible, based on FBI designations, until the individual is cleared by the FBI. And, boy, we all wish the FBI had been acting faster, and these individuals could have been removed more quickly. But that's not at the feet of the individual jailers. Their job is to maintain secure conditions, and that's what they were doing. And with respect to Bivens, Your Honor, the illegality or lawfulness of the conduct challenged isn't the determination of whether or not Bivens should be extended to a new location, a new context or not. What determines that is whether or not this Court has the institutional competence to make the decision, or it is the sort of decision that Congress should make. And especially since cases like this one are turning on whether or not the FBI was right or not in its terrorism designations, that implicates potentially sensitive intelligence information. If that is going to be pulled into a lawsuit, courts should not be in the business of creating those lawsuits and creating possible risks for intelligence information. That is precisely the sort of decision that Congress, rather than the courts, should make. Breyer, anything about the hypothetical I gave, of course, is a real one, not this case. But if you cut Bivens off totally, what prevents that from recurring? I mean, that was a pure hypothetical? You get my point. No, Your Honor. I think, actually, there's this case proves exactly what happens. We have an OIG report. And sometimes there are Bivens. There are many, many remedies in the judicial system. Right. We have ABS. We have and there was an FTCA claim that was brought by the predecessors of these plaintiffs in which they were covered money on in a settlement. There are lots of remedies that occur. And, indeed, in this case, with respect to the individual guards, there was a lawsuit against them in the Third Amendment complaint. The OIG report recommended discipline, and discipline was meted out. Thank you. Thank you, counsel. Ms. Muropol. Mr. Chief Justice, and may it please the Court. Under Petitioner's theory, any Muslim or Arab noncitizen present in this country could be placed for months in solitary confinement for violating the immigration law. But this Court has a historic role to play in ensuring that race and religion do not take the place of legitimate grounds for suspicion, and in deterring future Federal officials from creating government policy to do the same. Now, what the role includes the shaping and announcement, really, of private damages remedies? The we've been very explicit about the restraint in extending the Bivens action beyond its original contours. That's correct, Mr. Chief Justice. And we don't believe that this requires any extension of Bivens whatsoever. When this Court heard Iqbal, the Court distinguished between Mr. Iqbal's claim of religious discrimination, which the Court assumed would have required an extension of Bivens, and the Court assumed that it would be so extended because the issue was not directly argued before the Court. But the Court treated differently Mr. Iqbal's claim for an equal protection violation, noting that the Court had allowed Bivens claims for equal protection violations under Davis, and there's no way to read the distinction between those two claims in Iqbal other than that an equal protection claim, such as the one that these Respondents have, arises in a familiar Bivens context. The Court has in the Bivens. There is nothing new here. Now, what Petitioners are going to do is to go back to the Bivens case. That was failure to give medical treatment. That's correct. In Carlson the Bivens, the gender discrimination case, and Coleman v. Miller, I think. The denial of medical treatment. Carlson, yes. But then we've been very careful in subsequent cases to say we go no further. This is for the Congress. I think you're asking us to go further. I think what you're asking for is a legitimate argument with many valid points to it. What you're asking for is to create a new Bivens cause of action. Well, if it is a new Bivens cause of action, Your Honor, I submit that it is an appropriate one here. Now, what the DOJ Petitioners argue is that Bivens should not be extended because they were setting national security and immigration policy. But the core of our complaint is that there was no sensitive national security judgments being exercised. No one was being vetted. No one was determined to be a threat. This is not a situation where the Court would have to look into sensitive national security determinations that were made. Rather, if there was national security judgment exercised, it was the judgment that in this case race or religion could play the part of legitimate suspicion, could play a proxy. And exploring that ---- Robertson, I'm not sure I understand your point. It was the implementation of national security policy in response to the 9-11 attacks. And the idea was to detain people. Every one of the individuals detained was in violation of their immigration status, right? That's correct, Your Honor. It was to detain those individuals until they were properly cleared and could be ---- could be released. Now, you may disagree with that approach to the policy, but what concerns me and why the restraint is appropriate in the Bivens context is that it is a way of challenging national policy through damages actions against the individual who is implementing it. And I think that is an extraordinary departure from where we have recognized Bivens remedies in the past. This does arise in a national security context. Mitchell v. Forsyth also arose in a national security context. The question is whether the national security context of these detentions, the type of determinations that were being made, are determinations that are unsuited for Bivens because either they should be left to Congress or they are outside of this Court's core competence. And I would submit that this is precisely the kind of examination that is within this Court's core competence. Robertson, I guess my point is a different one. I understand the argument that there are constitutional violations. But the question that you're asking the Court to do is to shape a remedy for that, a remedy that Congress has not provided. And to look at it in the simplest terms, I mean, it has been 40-whatever years since we adopted an approach to implied rights of action under statutes, where we say if Congress wants people to be allowed to bring individual damages actions, they pretty much have to say so. And it seems to me that it's the same approach here, except, of course, you're dealing with the Constitution and the idea that the Court lacks the institutional competence, saying, okay, there's a constitutional claim against a national policy. We think the best way to consider that constitutional challenge is to allow people to sue individuals responsible for implementing it for damages. You shape the policy, the national government, in response to 9-11. Therefore, you have to pay money because it's been a determination that that was unconstitutional. Bivens. Well, it is certainly true that the Court has stepped back from freely implying private causes of action, but in every Bivens case that has come before this Court, the Court has still engaged in the two-step inquiry, looked to see whether there are special factors that should keep the Court from staying at hand, and weighed the interests on the other side of the equation, too. And each time, the Court has reemphasized that Bivens is about deterring individual Federal officer misconduct. Now, when a Federal official creates an unconstitutional policy, he's creating policy, but he is also acting as an individual to violate what in this case would have to be clearly established constitutional norms. Roberts. Roberts. I understand that. That's the point made by your friend on the other side, though, of over-deterrence. When you have the Attorney General, the Director of the FBI, the Director of INS, sitting down and making, what are we going to do to respond to this crisis? And people in the old enough 9-11 sort of have a better sense of what that crisis was like. And if you imply a Bivens action, one of the things they're going to enter into there, what is best, what is appropriate, and presumably also what's constitutional, they're going to say, well, gosh, if, you know, I'm wrong, I'm going to be sued, not because I'm the Attorney General, but as an individual. And part of the policy that we've announced is that we don't want people forming policy to have to worry about they're going to have to pay if the policy is found infirm. I have two responses to that, Mr. Chief Justice. First of all, qualified immunity creates a powerful protection for Federal officials who are undertaking a good-faith effort to protect our national security, which everyone agrees is of paramount concern, but who do so believing their actions to be lawful, even if they are mistaken. There is already that incredibly substantial protection. Second, I don't believe that it would be a threat to the Republic to provide the Attorney General with incentives to not create policy that violates clearly established law. I see the threat coming from the other side. I would like to make sure to take the time to correct. Breyer, I'm going to ask you one other thing, which is, has this been fully argued out below? I mean, I think it is an enormously important and very open question. And we can say on the one hand, just what was said, I think everything the Chief Justice said is true. There is a problem in this time of real national emergency to over-deter people from doing what they reasonably think is necessary. And they have the authority for security, not the judges. At the same time, the law of this Court correctly, I think, is, but there is no blank check even for the President. And if there is no blank check, that means sometimes they can go too far. And if they have gone too far, it is our job to say that. Now, there are considerable advantages, as I pointed out, saying, at the time, they are going to say yes, because there is a big, frightening thing happening. But maybe they went too far too fast, and then this offers a remedy later, and maybe the deterrence is good. Okay? You see it with both sides. Has that been fully argued in this case? If I go and look in the record, can I find a question that I have wondered about for quite a long time, fully answered? I don't believe so. I think the question you are posing is whether damages would actually be a less intrusive remedy in this situation than allowing for an injunctive relief claim at the outset, if I understand your question correctly. And a set of cases. And yes, no, I don't believe that that has been fully addressed below. The circuit, of course, found that no extension of Bivens was required. So the circuit didn't engage in the analysis of whether, if an extension is required, one in this situation would be called for. My friend argued both on reply and from the podium that even the question, that this case cannot be distinguished from Iqbal, but what distinguishes this case from Iqbal is that we, Respondents, have a factual allegation that the DOJ Petitioner's target Muslims and Arabs for harsh treatment, and that they imposed this treatment knowing there was no reason to suspect Respondents of ties to terrorism. Now, my friend argued that even if Petitioner's, DOJ Petitioner's, had known that there was that had known that many were arrested without an articulable tie to terrorism, that the Petitioner's had reason to believe that some among that group might have potential ties to terrorism. And that explains the harsh treatment without raising an inference of discriminatory intent. But I don't believe that is a fair reading of the complaint or the OIG report. Respondents allege in paragraph 47 that Petitioner's received detailed daily reports of the arrests and the detentions, and that they learned that the FBI had no basis to suspect Respondents and the class of ties to terrorism. There was no reason to suspect or to think that any of these individuals were had an articulate that there was an articulated basis to suspect them of ties to terrorism. Kennedy, we're talking about adequate remedies. Can you tell me, as Justice Ginsburg pointed out, we didn't, these detainees didn't have access to the outside. Were there any legal proceedings filed, injunctive proceedings, after, say, month 1, month 2, month 3? And were those remedies completely inadmitted to district courts to look at this and say that we're not going to give relief? There were some habeas petitions filed. In general, the government's response to those petitions being filed was to move the detainee up to the front of the list, to clear him so that he could be removed from the country and from the restrictive conditions of confinement before a court could have the opportunity to rule on the legality of the detention. And importantly, those habeas petitions were about the right to detain these people in itself, not about conditions of confinement. It is still not clear today that one can use a habeas petition to challenge conditions of confinement, and it wasn't clear in the Second Circuit at the time, either. So while habeas petitions were filed eventually when some detainees finally had access to counsel, although restricted access, those, those petitions were not actually ruled on by a court. The court no court had the opportunity to determine whether what was happening to the detainees was lawful or not. And that was part of DOJ Petitioner's entire policy of harsh treatment. It was not just to impose maximum pressure. It was also, as we allege in paragraph 61, to keep the detainees from accessing the outside world. Now, my friend argued that the DOJ Petitioner's cannot be on the hook for the substantive due process claim in this case, which a claim that was not presented in Iqbal. There was no conditions claim in Iqbal, just an equal protection claim. Because they – because the DOJ Petitioner's did not set all the details of the restrictive conditions of confinement, but their order itself, paragraph 61, requires keeping individuals in solitary confinement, in isolation. That is the way, within the prison system, people are kept from accessing the outside world. It cannot be done in a general population unit. So an order that requires solitary confinement for individuals whom are arrested in connection to the terrorism investigation, but whom the Attorney General and the other DOJ Petitioner's know there is no nondiscriminatory reason to suspect of any ties to terrorism. That states the substantive due process claim. That is so excessive as to be arbitrary and punitive. This is what the panel found so compelling, I believe, about the merger of the New York list and the national list, that it was not a situation where some of the men on that list perhaps hadn't been vetted. Rather, the entire list, 300 men, were people for whom the FBI had not stated any interest or lack of interest. And it was this list of men who we allege Attorney General Ashcroft ordered should be treated as of interest to the 9-11 investigation. Kennedy. Kennedy. If we – if we hold that our previous cases instruct that we should not go further, would the officials conspire with each other? Yes, absolutely. Is there – I was thinking of the screws. Is there precedent on that in your point, in your favor? Yes. What the circuit held as to that is that the question of whether officials can conspire with each other is so fact-intensive and had been so inconclusively briefed in the district court that it was required to remand back to the district to determine sort of how they might have conspired with each other, whether – what their positions were vis-a-vis each other such that a 1985 claim would be appropriate. Is there precedent in your favor on this point that there can be this conspiracy if it's established by the facts? Yes. And I believe the cases cited by the Second Circuit by the panel are precedent in our favor for that. What is so fact-intensive about the argument that government officials, the government is the entity, and officials within that same entity don't conspire among themselves, they're just doing their – doing their jobs? Well, I think it depends on the role of the high-level officials vis-a-vis the low-level officials at the Metropolitan Detention Center. Certainly, we argue that officials at such disparate levels of the Federal government, which is vast, could – could be held to have conspired with each other. But I don't think it is an argument that was fully developed before the district court, and that was what the circuit held, and that's why it should be remanded to the circuit and not remanded to the district. I want to make sure to address the arguments by the MDC Petitioners, because really their argument about extending – about not extending Bivens for the claims against those officials is very different from the argument by the DOJ Petitioners. Every judge who has considered the issue has agreed that the claims that Hastie and Sherman were deliberately indifferent to months of physical and verbal abuse arise in a familiar Bivens context and should be allowed to go forward. Carlson v. Green? Yes, exactly. I thought the Second Circuit majority said yes as to Hastie – Hastie, the deliberate indifference, but not as to Sherman. That's correct. I must have misspoke. I apologize. Yes. The deliberate indifference claim goes forward against Hastie, and then there were the claims against Hastie and Sherman for the official conditions of confinement at the Metropolitan Detention Center. These are claims that the men were held in solitary confinement for months, deprived of sleep, deprived of exercise. This is not just the MDC Petitioners in following the orders from their superiors in the Bureau of Prisons. They created the actual conditions of confinement. There is nothing in the record to suggest that the BOP ordered that all of the conditions that Respondents were subjected to, lights on in their cells 24 hours a day while they were in solitary confinement, that the solitary confinement continue without any individualized review. There is nothing in the record. Were they – were those conditions constitutional as to individuals about whom the FBI had reasonable suspicion of a connection with terrorism? That would depend. Placement in solitary confinement, if it is incredibly prolonged and incredibly restrictive, may be unconstitutional for anybody. We don't concede that the conditions – Alito, is your argument dependent on that? No. It's a proposition that it would be unconstitutional even as to those who, with respect to whom the FBI had reasonable suspicion. No. And that brings up an incredibly important point that I want to make sure to get out, which is that we disagree with the MDC Petitioner's statement that there was a terrorism designation here, that there was reason to believe that any of the 9-11 detainees had ties to terrorism. There was no designation. What there was is the fact that some men were arrested in connection to the terrorism investigation. Alito, their position, as I understand it, the way it was presented today, was that the FBI had a list, and there was no way they could determine what degree of information the FBI had as to any particular person. But they were told what information the FBI was relying on. That's in paragraph 70, 71, through 74 of our complaint, that actually a liaison to the headquarters investigation was providing the MDC with information about all the men. Alito, with all the information, do you think that the FBI, in a sense, investigation of something sensitive like this about terrorism, would necessarily have told people at MDC every bit of information they had connecting people with terrorism? Well, our factual allegation is that they were told all the information that was relevant to the threat that the men posed to the institution. And also important here is what the OIG has explained about the meaning of the of-interest designation. Being determined by the FBI to be of interest to the 9-11 investigation meant only that they were not not of interest. This is not just something that was happening in New York. The OIG quotes the head of the National Security Unit of the INS, who explains that if the FBI could not state whether or not it had an interest in an individual, that individual was held as of interest to the 9-11 investigation. So even if there is word being sent out that, you know, these men are of interest to the investigation, we have to be careful with them, what the MDC Petitioners received was that of-interest designation, which meant very little based on the policy being applied here. And then they received the detailed information. For example, that Ahmed Khalifa was arrested, was encountered by the FBI in the context of the 9-11 investigation, had violated the immigration law, and that the FBI might be interested in him. This is the actual information that was provided that we have made available in the complaint. Breyer, the FBI goes into a rooming house after having information there's a nuclear weapon on the floor. They find it. And there might be another. Would they be justified in taking into custody every single person in that rooming house and looking into it? I mean, for how long? Would you say to them, no, you can't do it? Because we don't know. There are people on the floor. They know nothing about them, actually. We know nothing about them. All we know is they're in the rooming house. And we also know there was a nuclear weapon. And that isn't totally fanciful. It could happen. And so what are they supposed to do and how long? Well, we don't challenge the fact that these men were detained at all. And we don't challenge that they were investigated while they were detained. So even if they had been detained, you know, some of them were up to eight months, which is a long period of time. And there's no challenge to that detention in this case. The challenge is to the way they were treated while they were detained, that if you need to investigate after a national security emergency, there are a lot of tools at the government's disposal to do so. What you cannot do is single out a group of people whom you know there is no basis to suspect them of any ties to terrorism beyond sharing racial and religious characteristics with the 9-11 hijackers, and to decide that that group of people poses such a threat that they must be placed in the most restrictive conditions of confinement that exist in the Federal system while we take the time, eight months, up to eight months, to determine whether there actually is any basis to suspect them of anything other than an immigration violation. And at the end of the day, oh, actually, there wasn't. Everybody was cleared and deported. As one would expect from a policy that is not based on investigating, based on actual suspicion, but is rather a blunderbuss attempt to gather all of the Muslim and Arab noncitizens whom one has authority over by virtue of their immigration detentions, and hold them in restrictive conditions of confinement while they are treated as suspected terrorists. If I could get back for a moment to one of the Bivens questions, and that's about whether Bivens is appropriate for altering policy. I don't know if I was able to get this point out as well as I'd like to before, to explain that I don't think that there is really any precedent for the idea that you can't use Bivens to deter creation of a clearly unconstitutional policy. And if the Court did rule in that way, what would there be to deter the creation of unconstitutional policies in the future? Now, of course, policies can be stopped as they are ongoing, but that does not protect the individual against whom, you know, potential serious law enforcement action has been taken. Roberts. Roberts. Well, I suppose one answer would be the normal injunctive action would challenge the constitutionality of the policy, which would seem, at least at first blush, to be a more appropriate way of doing it than to the individual damages actions against officials responsible. But an injunctive claim, while it could stop, currently, current unconstitutional conduct cannot deter future unconstitutional conduct from occurring. It doesn't deter the future Attorney General from creating an unconstitutional policy. And if national security policy is somehow insulated from judicial review, without even a determination that this is the type of national security policy where we could expect there should be sensitive judgments made, if in that situation there is no Bivens remedy, then there are times when the Court will play no – will be able to play no role in reviewing what has occurred, because the individual simply can't get into court fast enough. Maybe in a situation like this, they're denied from getting into court for a period of time, and then when they finally do, the claim, the way that they've been treated is stopped. You know, they're released. Someone else is picked up instead. There's never a chance to actually undertake judicial analysis of what has been occurring. If qualified immunity justifies what was done here, or if Petitioners  claim, those are bases to affirm the circuit. But if there is no cause of action at all, if individuals who are the subject of clearly unconstitutional national security policy don't even have the opportunity to get into the court, then there is nothing to deter even more excessive exercises of government power in the future. If there are no further questions. Roberts Thank you, counsel. General Gershengorn, four minutes. Gershengorn Thank you, Mr. Chief Justice. A few quick points. First, a few short corrections of the record. I apologize for the confusion about the date. It's not in the complaint, the date of the list merger decision. The OIG report suggests it was on November 2nd. And then, Justice Ginsburg, you had asked about the warden visits at J.A. page 224. It says, on September 20th, 2001, various wardens, including M.D.C. Warden Zenk, reestablished legal visits, legal telephone calls, and legal mail for the September 11th detainees. I'd like to make the date of that. That was September 20th, 2001. And that's on page 224 of the Joint Appendix. Three points on the law. First, this would be a massive extension of Bivens. Malesko said, Justice Kennedy, you had asked, that unlike a Bivens remedy, which we have never considered a proper vehicle for altering an entity's policy, injunctive relief has long been recognized as the proper means for doing so. That makes good sense. It cannot be that the Secretary of the Treasury, who promulgates a policy that's later found unconstitutional, could be liable personally to all the banks for the unconstitutional policy. Bivens is not, Justice Breyer, absence of Bivens is not lawlessness. It is not a blank check. And there is — it is incorrect as — to say that there is no way to get into court. The way to get into court to challenge a policy is through an APA. It's through injunctive relief. And although my friend on the other side suggests that a damages remedy is not a threat to the Republic or is a less intrusive remedy, that's exactly the — the — the judgment that this Court is ill-equipped to — to make and that Congress should make. With respect to 1985-3, Justice Kennedy, I want to make just one quick point, which is that the — the — the DOJ defendants would be, and all the defendants, would be subject to qualified immunity for 1985-3 because it was not clear that officials within a corporate unit could — could conspire with each other. There's case law suggesting they couldn't. And it was unclear specifically in the Second Circuit whether 1985-3 applied at all to Federal officials. So qualified immunity would eliminate the 1985-3 claim. And then if I could close with the — the — the Iqbal pleading and what we're talking about here, the — the other side has made clear they're not talking about the initial treatment and they're not even talking about the length of time. They're talking about the conditions of confinement and the fact that conditions that could lawfully be imposed with people in individualized suspicion were imposed on a much broader group. But I submit that that ignores the perspective that the Attorney General, even assuming that he was the person who made the policy decision, which, as Judge Radley suggested, we should not assume. Kennedy, just one point on — on 1985. The fact that it wasn't clear that there was a remedy under 1985, it doesn't follow that it wasn't clear that there wasn't a right that was being violated. That's different. So with respect to the interagency conspiracy, I think that suggests even the right wasn't inviolated. And if the statute doesn't — it's not clear the statute applies at all to them, we do think that's a situation in which qualified immunity would attach. But just to close with — with what the Attorney General knew. The Attorney General knew that he had aliens who were legally detained as out-of-status and had been arrested in connection with pent-bomb, that restrictive conditions of confinement, not the unofficial conditions which have no connection to my clients, but the restrictive conditions of confinement were okay for some with individualized which ones were and which ones were not subject to that condition. In that situation, he made the decision to subject the whole group to a hold-until-cleared policy till they could figure it out. The idea that because in 20-20 sign sight, we can identify the particular individuals who were not — had not — who were not connected at all to terrorism and thus were wrongly detained does not change the reasonableness of his — of his judgment, the fact that you can't infer punitive intent and discriminatory content and the intent and the fact that it was not clearly established that the List merger decision, which is what the core of what the Second Circuit decided, that the List merger decision was unconstitutional when made. If there are no further questions. Roberts. Thank you, counsel. General Gershengorn, before you leave the podium, I'd like to note that the Court thanks you for your service to the Court as acting Solicitor General over the past many months. Thank you. The case is submitted.